IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

TAMMIE LYNN DEDRICK          )
                             )
v.                           )          NO. 1:08-0044
                             )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform work at the light level of exertion (tr. 21) during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 18)[1] should be denied.

---

[1] Actually, the plaintiff captioned her motion as a motion for summary judgment. However, the Court has construed it as a motion for judgment on the administrative record. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998).

1

# I. INTRODUCTION

The plaintiff filed an application for DIB on June 24, 2005, and for SSI on July 18, 2005 (tr. 57), alleging disability due to "back problems, failed back syndrome and leg pain," with a disability onset date of July 21, 2004. (Tr. 34, 37-38.) Her applications were denied initially and upon reconsideration. (Tr. 39-48.) A hearing before Administrative Law Judge ("ALJ") Linda Gail Roberts was held on January 9, 2008. (Tr. 324-44.) The ALJ delivered an unfavorable decision on January 18, 2008 (tr. 13-22), and the plaintiff sought review by the Appeals Council. (Tr. 9.) On June 19, 2008, the Appeals Council denied the plaintiff's request for review (tr. 5-7), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on February 6, 1964, and was 40 years old as of July 21, 2004, her alleged onset. (Tr. 57.) She completed high school and her past jobs include employment as a machine operator in a boot factory, laborer in a textile factory, production worker in a mattress factory, assistant manager at a gas station, and cook, cashier, and floor manager in a fast food restaurant. (Tr. 90, 120, 328.)

## A. Chronological Background: Procedural Developments and Medical Records

In 1997, the plaintiff underwent a lumbar diskectomy and back fusion, and in 1998, she had lumbar surgery. (Tr. 179, 265.) The plaintiff reported that the surgery "helped her for about 7 years" until July 21, 2004, when she injured herself at work by lifting a case of boots. (Tr. 179, 331.) On July 21, 2004, the plaintiff presented to Wayne Medical Center with complaints of lower back pain.

2

(Tr. 165-66.) She was diagnosed with an acute myofascial strain and lower back pain, and she was prescribed Toradol.[2] *Id.* On the same day, an x-ray of the plaintiff's lumbar spine revealed "mild disc space narrowing at L4-5," small osteophytes at L4 and L5, [s]light straightening of the normal lordotic curvature," but no fractures. (Tr. 168.) On July 22, 2004, the plaintiff was examined at Wayne Medical Center and her diagnosis remained unchanged. (Tr. 158-59.) She was prescribed Lortab[3] and Soma.[4] *Id.*

On July 27, 2004, Dr. Natasha Harder, a primary care physician, examined the plaintiff, diagnosed her with lower back pain, and prescribed Lortab. (Tr. 187.) One week later, the plaintiff presented to Dr. Harder and her diagnosis and prescribed medication remained unchanged. (Tr. 186.) On August 5, 2004, the plaintiff had magnetic resonance imaging ("MRI") on her lumbar spine that indicated: (1) at T12-L1, no significant abnormality; (2) at L1-2, a posterior central disc bulge with no significant stenosis; (3) at L2-3, a left paracentral herniated nucleus pulposus ("HNP") causing mild stenosis, severe narrowing of the left lateral recess, mild left foraminal stenosis and possible nerve impingement; (4) at L3-4, a mild diffuse disc bulge with no central stenosis, but mild left foraminal stenosis; (5) at L4-5, small epidural fibrosis at the site of earlier surgery and residual spondylosis and disc bulge causing mild foraminal stenosis; and (6) L5-S1, no significant disc abnormality, but mild facet hypertrophy without significant stenosis or impingement. (Tr. 152.) The

---

[2] Toradol is a nonsteroidal anti-inflammatory drug that is prescribed "for moderately severe acute pain." Saunders Pharmaceutical Word Book 713 (2009) ("Saunders").

[3] Lortab is prescribed for the relief of moderate to moderately severe pain. Physicians' Desk Reference 3143 (63rd ed. 2009) ("PDR").

[4] Soma is used for the relief of discomfort associated with acute and painful musculoskeletal conditions. PDR at 1931.

plaintiff returned to Dr. Harder on September 23, 2004, and she diagnosed her with a bulging disc. (Tr. 185.)

On October 20, 2004, Dr. Thomas J. O'Brien, a neurosurgeon with Tennessee Spine and Sports Medicine, examined the plaintiff and reviewed her MRI. (Tr. 153.) He diagnosed her with chronic back pain and pseudarthrosis,[5] which he believed to be the result of a prior surgical procedure and not from her July 2004 workplace injury, and he concluded that the "L2-3 disc findings are not clinically significant." *Id.* He recommended against surgery for the plaintiff and noted that "she is capable of working."[6] *Id.* On the same day, Dr. Harder replied to a questionnaire and stated that she had treated the plaintiff regularly since October 24, 2001.[7] (Tr. 254.) She diagnosed the plaintiff with arthritis and degenerative disc disease and noted that her back pain had "greatly increased" since July 21, 2004, which made it "impossible for her to work." *Id.* On November 1, 2004, Dr. Harder examined the plaintiff, diagnosed her with depression, and prescribed Wellbutrin.[8] (Tr. 183.)

---

[5] According to Allaboutbackpain.com, pseudarthosis means false joint and is used "to describe either a fractured bone that has not healed or an attempted fusion that has not been successful. A pseudarthosis usually means that there is motion between the two bones that should be healed (or fused together)."

[6] The plaintiff explains that she saw Dr. O'Brien "at the request of her employer" for her workers compensation claim. Docket Entry No. 19, at 6, 12.

[7] Although Dr. Harder indicated that she had treated the plaintiff since 2001, there are no records for Dr. Harder prior to April 13, 2004. Dr. Harder saw the plaintiff on nine occasions from April 13, 2004, through November 1, 2004. (Tr. 183-91.) Although the plaintiff indicates that Dr. Harder saw her as late as August 1, 2005, *see* Docket Entry No. 19, at 11, the August 1, 2005, office visit notes do not include Dr. Harder's name nor does the handwriting appear to be the same as the handwriting on Dr. Harder's office notes in 2004.

[8] Wellbutrin is an antidepressant used in the treatment of major depressive disorder. PDR at 1648-49.

4

On referral by her employer, Dr. George Lien, a neurosurgeon with Midstate Neurosurgery, examined the plaintiff on December 4, 2004. (Tr. 147-48.)  Dr. Lien reviewed the plaintiff's MRI and opined that she had "a left sided disk herniation at L2-L3" but that the herniation did not "fit her symptoms." (Tr. 147.)  He noted that the plaintiff was taking Wellbutrin, Lortab, and Soma. *Id.* Dr. Lien opined that the plaintiff's disc herniation "is not causing her current pain and could have occurred at any point before a scan was done; it also could have preceded any new report of lifting injury since I do not feel her current pain is related in any way to that disk herniation." *Id.*  Dr. Lien diagnosed the plaintiff with chronic failed back syndrome and determined that she was not a candidate for surgery. *Id.*  He also noted that the plaintiff had strength in her legs but that "it would not surprise [him] if she [had] difficulty tolerating substantial work from a symptomatic standpoint." (Tr. 148.)  Although he suggested a functional capacity evaluation, he expressed concern that such an evaluation would not be valid because he expected that she "would not give her full effort, secondary to pain."  He concluded that he had nothing to offer the plaintiff "in terms of treatment." *Id.*

On March 10, 2005, Dr. Timothy A. Strait, a neurosurgeon, examined the plaintiff and found, based on spine films and the August 2004, MRI, that she had tenderness in her lower back, "disc space narrowing at L4-5 . . . , epidural fibrosis at L4-5 . . . , [and] a left paracentral disc protrusion at L2-3." (Tr. 179-81.)  Dr. Strait opined that the plaintiff had "unrelenting mechanical lower back pain" but that there was no evidence of neural compression syndrome. (Tr. 181.)  On the same day, the plaintiff had an MRI of her lumbar spine which revealed small left protrusions at L1-2 and L2-3 without evidence of significant spinal stenosis, "moderate to marked stenosis of the left lateral recess" at the L4-5 level, and "mild stenosis at the left L3-4 nerve root foramen." (Tr. 177-78.)  The

plaintiff returned to Dr. Strait on July 11, 2005, complaining of lower back and bilateral leg pain. (Tr. 175.) Dr. Strait noted that an MRI of the plaintiff's lumbar spine revealed epidural fibrosis and small disc protrusion at L4-5 but that these findings did not correlate with his clinical examination of the plaintiff.[9] *Id.* As a result, he did not recommend surgical intervention for the plaintiff. *Id.*

On August 11, 2005, Tennessee Disability Determination Section ("DDS") non-examining physician Dr. Joe G. Allison completed a physical residual functional capacity ("RFC") assessment on the plaintiff (tr. 205-210) and opined that she could occasionally lift/carry up to twenty pounds and frequently lift/carry up to ten pounds. (Tr. 206.) He noted that the plaintiff could stand/walk and sit for approximately six hours in an eight hour workday, had unlimited capacity to push and pull, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 206-07.) Dr. Allison also determined that the plaintiff should "avoid concentrated exposure" to extreme cold, vibration, and hazards. (Tr. 209.)

On October 18, 2005, the plaintiff presented to Dr. Micky Busby with complaints of chronic back pain and bilateral leg pain. (Tr. 231.) Dr. Busby diagnosed her with chronic back pain, unconfirmed rheumatoid arthritis, osteoarthritis, and "possible" restless leg syndrome. (Tr. 232.) On November 17, 2005, the plaintiff returned to Dr. Busby and he diagnosed her with bilateral leg pain and neuropathy. (Tr. 229.) Dr. Busby noted that the plaintiff complained of burning sensations on her arms and bottoms of her feet, and he opined that it was unlikely that her symptoms were caused by restless leg syndrome. *Id.* The plaintiff underwent a series of nerve conduction velocities

---

[9] Although, from his notes, it appears that Dr. Strait was referring to the March 10, 2005, MRI, his reference to epidural fibrosis tends to suggest that he may have been referring to the August 2004, MRI.

6

that "were consistent with mild left, L5, radiculopathy" (tr. 238) and Dr. Busby noted that steroids, blocking procedures, and physical therapy had not alleviated her pain. (Tr. 229.)

On November 17, 2005, the plaintiff presented to Dr. Jianping Sun, an anesthesiologist with the Nashville Pain Center, with complaints of radiating lower back pain. (Tr. 265.) He found her range of motion in her lumbosacral spine to be "moderately to severely limited." (Tr. 266.) Dr. Sun concluded that she had lower back pain, lumbosacral spondylosis without myelopathy, thoracic or lumbosacral neuritis or radiculitis unspecified, postlaminectomy syndrome, and osteoarthritis. (Tr. 267.) He prescribed pain injections for her back and Neurontin,[10] Soma, and Lortab. *Id.* The plaintiff returned to Dr. Sun on December 16, 2005, and reported that although the nerve blocks relieved her pain for two to three weeks, the pain had returned and was exacerbated by "any movement" or by sitting for lengthy periods of time. (Tr. 268.) Dr. Sun's diagnosis of the plaintiff remained unchanged and he prescribed Lortab, Neurontin, Soma, and a lower back injection. (Tr. 270.)

On January 18, 2006, non-examining DDS physician Dr. Glenda Knox-Carter completed a physical RFC assessment on the plaintiff (tr. 243-48) and opined that she could occasionally lift/carry up to twenty pounds and frequently lift/carry up to ten pounds. (Tr. 244.) She noted that the plaintiff could stand/walk and sit for approximately six hours in an eight hour workday, had unlimited capacity to push and pull, could frequently balance, kneel, and crawl, and could occasionally climb, stoop, and crouch. (Tr. 244-45.)

---

[10] Neurontin is used as an "anticonvulsant for partial-onset seizures" and to treat nerve pain. Saunders at 488.

On January 24, 2006, the plaintiff presented to Dr. Sun and reported that the lower back injection helped but that it gave her relief from her pain for only one day. (Tr. 271.) His diagnosis of the plaintiff remained unchanged and he prescribed Soma, Lortab, and Neurontin. (Tr. 273.) The plaintiff returned to Dr. Sun on February 23, 2006, and reported that the pain injections did not help but that her medications had stabilized her pain. (Tr. 274.) Dr. Sun's diagnosis and prescribed medications remained unchanged. (Tr. 276.) The plaintiff presented to Dr. Sun on March 23, 2006, and April 21, 2006, and he indicated that she was "stable and unchanged." (Tr. 277, 279.) He diagnosed the plaintiff with postlaminectomy syndrome and osteoporosis, but the medications he prescribed remained unchanged. (Tr. 278, 280.) On April 24, 2006, Dr. Busby examined the plaintiff and diagnosed her with rheumatoid arthritis and osteoporosis, and he prescribed Fosamax.[11] (Tr. 250.)

Dr. Sun examined the plaintiff three times between May 19, 2006, and July 19, 2006, and determined that her condition was largely stable and unchanged. (Tr. 281-86.) He diagnosed her with postlaminectomy syndrome and the medications that he prescribed remained unchanged. *Id.* On August 18, 2006, the plaintiff presented to Dr. Sun with complaints of left leg pain. (Tr. 287.) She reported that oral medications did not control her pain but that epidural injections had previously provided relief. *Id.* Dr. Sun's diagnosis and prescribed medications remained unchanged, and he gave her an epidural injection. (Tr. 287-88.)

Over the next several months, the plaintiff's reports to Dr. Sun alternated between her pain being "stable" (tr. 293, 295, 297) and "uncontrolled" (tr. 287, 291) by oral pain medication and his diagnosis of the plaintiff alternated between postlaminectomy syndrome and sacroiliitis. (Tr. 289-

---

[11] Fosamax is a "vitamin D supplement for age-related osteoperosis." Saunders at 305.

95.)  During that time, the plaintiff received one epidural injection (tr. 292) and her prescribed medications remained unchanged. (Tr. 289-95.) On November 14, 2006, Judy Jones, a nurse practitioner, examined the plaintiff and concluded that she had osteoporosis, degenerative disc disease in her spine, arthritis, and muscle spasms. (Tr. 262.)  From January to April of 2007, Dr. Sun's diagnoses and prescribed medications remained unchanged and the plaintiff received one epidural injection. (Tr. 296-98.)

On May 14, 2007, the plaintiff had an MRI of her thoracic spine that revealed "[m]ild dextroscoliosis, [n]o abnormal signal [] within the thoracic spinal cord, [and] [n]o focal posterior disc extrusion, spinal canal or neural foraminal stenosis . . . ." (Tr. 256.)  One week later, Dr. Claire Joseph, a neurologist, examined the plaintiff and noted that her reflexes were good and that she had 5/5 strength "throughout." (Tr. 263.)  On June 6, 2007, the plaintiff presented to Dr. Sun with complaints of back, neck, and arm pain. (Tr. 299.)  Dr. Sun diagnosed her with cervical spondylosis and prescribed Soma, Neurontin, and Lortab. *Id.*

On June 19, 2007, the plaintiff presented to Ms. Jones and she was diagnosed with degenerative disc disease. (Tr. 260.) On the same day, the plaintiff had an MRI on her cervical spine that revealed "[m]ild multilevel cervical spondylolysis," but normal vertebral bodies, a normal spinal chord, and no soft tissue swelling. (Tr. 252.)  The MRI also showed the presence of osteophyte formation at several levels, but these problems resulted in no nerve root entrapment or spinal cord compression. *Id.*  On July 6, 2007, Dr. Sun examined the plaintiff and he diagnosed her with cervical spondylosis and prescribed Soma, Neurontin, and Lortab. (Tr. 300.)  On July 17, 2007, the plaintiff presented to Ms. Jones who diagnosed her with degenerative disc disease and scoliosis. (Tr. 258.) Dr. Sun examined the plaintiff again on October 17, 2007 and November 15, 2007, and his diagnosis

9

and prescribed medication remained unchanged. (Tr. 301-03.)  On January 8, 2008, Dr. Sun completed a Physical Capacities Evaluation ("PCE") on the plaintiff and found that she could perform "[l]ess than a full range of sedentary work." (Tr. 319.)

The plaintiff submitted additional medical information to the Appeals Council that was not considered by the ALJ.  Those documents were not included in the administrative record filed in this case (Docket Entry No. 9).   However, by stipulation (Docket Entry No. 17), the parties supplemented the record to include Dr. Sun's report of March 12, 2008, and his treatment notes from February 6, 2008, and March 5, 2008.  Although these medical records were not before the ALJ and were not considered by the Appeals Council, *see* tr. 6, the Court has summarized those records because the plaintiff made reference to them and the defendant did not raise any objection.[12]

On January 9, 2008, and February 6, 2008, and March 5, 2008, the plaintiff presented to Dr. Sun with complaints of, respectively, "losing more bowel and bladder control" (tr. 320), "increased pain all month," and increased lower back pain. Docket Entry No. 17-1 at 4-6. Dr. Sun examined the plaintiff, diagnosed her with postlaminectomy syndrome, and continued to prescribed Soma, Neurontin, and Lortab. (Tr. 320-21) and Docket Entry No. 17-1, at 4-6.

On March 11, 2008, the plaintiff submitted an evaluation form to Dr. Sun and he indicated that she had postlaminectomy syndrome. Docket Entry No. 17-1, at 1.  He reported that her conditions had deteriorated, that on December 12, 2007, the range of motion of her lumbosacral spine was moderate to severely limited, and that her lumbosacral spine problems had contributed to her loss of bowel control. *Id.*  Dr. Sun stated that the plaintiff's oral medications "sometimes"

---

[12] In fact, the defendant even referred to Dr. Sun's March 11, 2008, evaluation in the "Statement of the Case" section of its memorandum. Docket Entry No. 26, at 8.

control her pain, that "lower dose spine injections [] control her pain and [her] pain fluctuates," and that her MRIs were consistent with her reported symptoms. Docket Entry No. 17-1, at 2. Dr. Sun also reported that the severity of the plaintiff's back pain limits her ability to sit/stand to 10 minutes at a time and her ability to concentrate to 25 minutes at a time, forces her to lie down for an hour and a half every eight hours, does not allow her to stoop, and requires her to have assistance "getting in and out of the shower [] and putting on her socks and shoes." Docket Entry No. 17-1, at 2-3.

## B. Hearing Testimony: The Plaintiff and the Vocational Expert

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and a Vocational Expert ("VE") testified. (Tr. 324-44.) The plaintiff testified that she completed high school and that she previously worked as a machine operator in a boot factory, laborer in a textile factory, production worker in a mattress factory, assistant manager at a gas station, and cook, cashier, and floor manager in a fast food restaurant. (Tr. 327-28.) She explained that she could no longer work due to back problems and arthritis in her hands. (Tr. 331-32.) The plaintiff testified that Dr. Sun treated her for back pain and that Ms. Jones treated her for "colds" and "things like that." (Tr. 332-33.)

The plaintiff testified that her back pain is constant and that sitting, standing, and stooping for lengthy periods of time exacerbates that pain. (Tr. 334-35.) She related that alternating between sitting, standing, walking, and lying down gives her some pain relief. (Tr. 335.) The plaintiff stated that her back pain increases after sitting or standing for five to ten minutes, that she is able to lift only a couple pounds, and that she is rarely able to stoop. (Tr. 335-36.) She explained that her back pain also causes numbness that radiates down her legs and arms and up to her neck. (Tr. 336.) The

11

plaintiff related that her back pain does not allow her to go to restaurants or shopping malls, and interferes with her ability to concentrate. (Tr. 337.)

The plaintiff testified that she has been diagnosed with rheumatoid arthritis and neck problems. (Tr. 337.) She related that her neck pain is constant and radiates down her arms and that her rheumatoid arthritis makes it difficult for her to grip items. (Tr. 334, 338-39.) The plaintiff also stated that her husband and daughter do all the cooking and cleaning at home, that her daughter helps bathe and dress her, and that she is no longer able to go camping, sew, or garden. (Tr. 334, 339-40.)

The VE, Dr. Kenneth Anchor, classified the plaintiff's previous jobs as an assistant manager as light and skilled work, as a computerized sewing machine operator as light and semi-skilled, as a cook as medium and skilled, as a cashier as light and semi-skilled, as a floor manager as light and skilled, as a factory laborer as medium and unskilled, and as a production worker as light and unskilled. (Tr. 341-42.) The ALJ asked the VE to consider Dr. Allison's physical RFC assessment and the work that the plaintiff would be able to perform, and the VE responded that she would have a light RFC and that the plaintiff would be able to perform all of her past work except the jobs of cook and factory laborer. (Tr. 342.) The ALJ then asked the VE to consider Dr. Knox-Carter's physical RFC assessment and the work that the plaintiff would be able to perform, and the VE again answered that she would have a light RFC and that the plaintiff would be able to perform all of her past work except the jobs of cook and factory laborer. (Tr. 343.) The ALJ next asked the VE to consider Dr. Sun's PCE and the work that the plaintiff would be able to perform, and the VE responded that the plaintiff would be precluded from performing full time work. *Id.*

12

# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on January 18, 2008. (Tr. 13-22.) Based on the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since July 21, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

* * *

3.    The claimant has the following severe impairments: lumbar spine spondylosis, cervical spine spondylosis, arthritis, osteoporosis (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; sit for a total of about 6 hours in an 8 hour workday; unlimited ability to push and/or pull; occasionally climb, stoop, crouch; frequently balance, kneel, crawl; unlimited ability to reach, handle, finger, feel.

* * *

6.    The plaintiff is capable of performing past relevant work as an assistant manager, sewing machine operator, cashier, floor manager, and production worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

13

7.     The claimant has not been under a disability, as defined in the Social Security Act, from July 21, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-22.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).  A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of

14

credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in

15

a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff

16

can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[13] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

---

[13] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

17

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process, and ultimately determined that the plaintiff was not disabled as defined by the Act. (Tr. 21.) At step one, the ALJ found that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since July 21, 2004, the alleged onset date of disability. (Tr. 15.) At step two, the ALJ found that the plaintiff's lumbar spine spondylosis, cervical spondylosis, arthritis, and osteoporosis were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ concluded that the plaintiff was able to perform her past relevant work as an assistant manager, sewing machine operator, cashier, floor manager, and production worker. (Tr. 21.)

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find her not disabled, as defined in the Act, at any time after July 21, 2004, through the date of the decision.

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ failed to assign appropriate weight to the medical opinions of her treating physicians, and erred in evaluating the credibility of her subjective complaints of pain.[14] Docket Entry No. 19, at 9-17. The plaintiff also argues that the hypothetical

---

[14] Although the plaintiff sets out two separate issues of the failure to properly evaluate the plaintiff's pain and the failure to make proper credibility findings, respectively, the Court has addressed these two issues together.

questions posed by the ALJ to the VE were "defective." Docket Entry No. 19, at 19-20, Docket Entry No. 29, at 7.

### 1. The ALJ properly assessed the medical opinions of the plaintiff's treating physicians.

The plaintiff contends that the ALJ did not properly weigh the medical findings of Dr. Sun and Dr. Harder. Docket Entry No. 19, at 9-16. Given the regularity with which Dr. Sun and Dr. Harder examined the plaintiff, they are classified as treating sources under 20 C.F.R. § 404.1502.[15] Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul.

---

[15] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

19

96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not assign controlling weight to Dr. Sun's or Dr. Harder's medical findings. (Tr. 21.) Specifically, the ALJ concluded that Dr. Sun's determination that the plaintiff only could perform "less than a full range of sedentary work" (tr. 319) was inconsistent with his treatment notes and medical evidence in the record, and that Dr. Harder's finding that it was "impossible for [the plaintiff] to work" was not supported by the medical evidence in the record.(Tr. 21.)

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factors of supportability and inconsistency in assigning "little weight" to Dr. Sun's and Dr. Harder's medical findings. (Tr. 21.) Dr. Sun examined the plaintiff

20

on numerous occasions between November 17, 2005, and January 8, 2008. (Tr. 265-321.) He initially diagnosed the plaintiff with lower back pain, lumbosacral spondylosis without myelopathy, thoracic or lumbosacral neuritis or radiculitis unspecified, postlaminectomy syndrome, and osteoarthritis, and prescribed pain injections for her back and Neurontin, Soma, and Lortab. (Tr. 267.) After examining the plaintiff on March 23, 2006, Dr. Sun narrowed his diagnosis of the plaintiff's impairments to postlaminectomy syndrome and osteoporosis, and from that point forward he diagnosed the plaintiff with either postlaminectomy syndrome, cervical spondylosis, or sacroiliitis. (Tr. 278, 280-95, 299-303, 318, 320-21.)

Although Dr. Sun's diagnoses of the plaintiff fluctuated, his course of treatment remained largely unchanged over the two and a half year period that he examined her and it does not support his ultimate determination that the plaintiff could perform "[l]ess than a full range of sedentary work." (Tr. 319.) In a March 2008, evaluation of the plaintiff Dr. Sun noted that the severity of her back pain limits her ability to sit/stand to 10 minutes at a time and her ability to concentrate to 25 minutes at a time, forces her to lie down for an hour and a half every eight hours, does not allow her to stoop, and requires her to have assistance "getting in and out of the shower [] and putting on her socks and shoes." Docket Entry No. 17-1, at 2-3. However, Dr. Sun repeatedly prescribed Neurontin, Soma, and Lortab for the plaintiff (tr. 267, 270, 273, 276, 278, 280-95, 299-303, 318, 320-21) and the plaintiff occasionally received epidural injections in her lower back. (Tr. 267, 270, 287-88, 292.) He also stated that the plaintiff's oral medications "sometimes" controlled her pain and that her "lower dose spine injections [] control her pain and [her] pain fluctuates." Docket Entry No. 17-1, at 2. Both Dr. Sun's unaltered treatment plan for the plaintiff and his statement that her pain, at times, was controlled by medication, belies his actual opinion of the severity of her pain. *Id.*

Although Dr. Sun apparently concludes that the plaintiff's pain was debilitating enough to limit her to "less than a full range of sedentary work" (tr. 319), it is appropriate to consider that Dr. Sun never changed her prescribed medications over the two and a half years that he treated her in an attempt to abate her pain, as well as his report that medication "sometimes" controlled her pain. Docket Entry No. 17-1, at 2.

The plaintiff argues that the ALJ mischaracterized the effectiveness of her prescribed treatment (Docket Entry No. 19, at 15) since the oral medications did not control her pain and the lower back epidural injections provided only short term pain relief. (Tr. 274, 287, 291.) However, on several occasions the plaintiff reported to Dr. Sun that her oral pain medication had stabilized her pain (tr. 274, 289, 293, 295), and Dr. Sun repeatedly noted that the plaintiff's condition was "stable and unchanged." (Tr. 277, 279, 281-86.) Dr. Sun's progress notes indicate that the plaintiff's treatment plan and medication regimen rarely changed (tr. 267, 270, 273, 276, 278, 280-95, 299-303, 318, 320-21), that the plaintiff reported that her oral medications stabilized her pain (tr. 274, 289, 293, 295), and that the prescribed medications were able to control the plaintiff's conditions. (Tr. 277, 279, 281-86.)

Additionally, Dr. Harder's treatment notes do not support her ultimate conclusion that the plaintiff's back pain made it "impossible for her to work." (Tr. 254.) Dr. Harder diagnosed the plaintiff with lower back pain on several occasions (tr. 186-88), noted that she had a bulging disc (tr. 185), and prescribed Lortab. (Tr. 185-87.) However, there was no indication in her treatment notes of the severity of the plaintiff's lower back pain and her treatment plan remained relatively unchanged. *Id.* Furthermore, Dr. Harder's progress notes from the plaintiff's examinations directly before and directly after she concluded that it was "impossible for [the plaintiff] to work" do not

indicate that the plaintiff complained of or that Dr. Harder treated her for lower back pain.[16] (Tr. 183-84.)  Instead, Dr. Harder diagnosed her with sinusitis and depression. *Id.*  In sum, neither Dr. Sun's nor Dr. Harder's treatment notes support their respective RFC determinations.

The ALJ also found that Dr. Sun's and Dr. Harder's RFC determinations were inconsistent with the medical evidence in the record. (Tr. 21.)  Over a three year period, the plaintiff underwent a series of MRIs, and had a nerve conduction study and at least one x-ray that largely indicated that her back impairments were mild or "not significant." (Tr. 152, 168, 177-78, 229, 252.)  On July 21, 2004, an x-ray of the plaintiff's lumbar spine revealed "mild disc space narrowing at L4-5," small osteophytes at L4 and L5, [s]light straightening of the normal lordotic curvature," but no fractures. (Tr. 168.)  An August 5, 2004, MRI of the plaintiff's lumbar spine indicated that she had either mild impairments or no significant abnormalities with her lumbar vertebrae, except at the L2-L3 level where the exam revealed a left paracentral herniated nucleus pulposus ("HNP") causing mild stenosis, severe narrowing of the left lateral recess, mild left foraminal stenosis and possible nerve impingement. (Tr. 152.)  On October 20, 2004, after reviewing the results of the plaintiff's MRI, Dr. O'Brien found that the "L2-3 disc findings are not clinically significant" (tr. 153) and on December 14, 2004, Dr. Lien noted that she had a "left sided disk herniation at L2-L3" but that her diagnosis did not "fit her symptoms." (Tr. 147, 153.)

---

[16] The ALJ noted that Dr. Harder only saw the plaintiff three times for complaints of back pain after her injury in July of 2004. (Tr. 21.)  The plaintiff maintains that Dr. Harder saw the plaintiff at least six times between July of 2004 and August of 2005, for back pain. Docket Entry No. 19, at 11.  Although Dr. Harder clearly prescribed pain medication to the plaintiff for her back pain on some occasions (tr. 185-87), it is not entirely clear on what occasions and the extent to which Dr. Harder treated the plaintiff's back pain since on several occasions Dr. Harder referred the plaintiff for other medical treatment or noted that she was receiving treatment elsewhere (tr. 185, 188), and one other occasion Dr. Harder made no note at all of the plaintiff's back pain. (Tr. 183-84.)

On March 10, 2005, the plaintiff had another MRI of her lumbar spine which revealed small left protrusions at L1-2 and L2-3 without evidence of significant spinal stenosis, "moderate to marked stenosis of the left lateral recess" at the L4-5 level, and "mild stenosis at the left L3-4 nerve root foramen." (Tr. 177-78.) Dr. Strait reviewed the results of that MRI and opined that the plaintiff's lumbar spine demonstrated epidural fibrosis and small disc protrusion at L4-5 but that these findings did not correlate with his clinical examination of the plaintiff. (Tr. 175.) On November 17, 2005, the plaintiff underwent a nerve conduction study and Dr. Busby opined that it revealed that she had "mild left, L5, radiculopathy." (Tr. 229.)

The plaintiff had two more MRIs on May 14, 2007, and June 19, 2007. (Tr. 252, 256.) The May 14, 2007, MRI of the plaintiff's thoracic spine revealed mild dextroscoliosis and "[n]o abnormal signal [] within the thoracic spinal cord. No focal posterior disc extrusion, spinal canal or neural foraminal stenosis . . . ." (Tr. 256.) The June 19, 2007, MRI of the plaintiff's cervical spine showed "[m]ild multilevel cervical spondylosis" with normal vertebral bodies, a normal spinal chord, and no soft tissue swelling. (Tr. 252.) That MRI also revealed the presence of osteophyte formation at several levels, but these problems resulted in no nerve root entrapment or spinal cord compression. *Id.*

In sum, Dr. Sun's and Dr. Harder's assessments of the plaintiff's RFC were not supported by their own treatment notes and were inconsistent with the objective medical evidence in the record. Furthermore, Dr. Sun's prescribed treatment for the plaintiff over nearly a two year period was subject to minimal variation and did not support his overall conclusion that the plaintiff could perform "less than a full range of sedentary work." (Tr. 319.) The ALJ provided "good reasons," as required by Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2)), for awarding "little weight" to Dr. Sun's and Dr. Harder's assessments of the plaintiff's RFC and substantial evidence in the record supports that determination.

The ALJ also properly afforded the RFC assessments of DDS physicians Dr. Allison and Dr. Knox-Carter significant weight. (Tr. 21, 202-10, 243-48.) Since the treating physicians' opinions were not given controlling weight by the ALJ, the regulations require the ALJ to explain the weight given to the State agency physicians. *See* 20 C.F.R. § 404.1527(f)(2)(ii) ("Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist...."); SSR 96-6p, 1996 WL 374180, at *1 (ALJ cannot ignore the findings of fact by State agency medical and psychological consultants and must explain the weight given to such opinions in their decisions). The ALJ also complied with 20 C.F.R. § 404.1527(d)(3)-(4) by focusing on the factors of consistency and supportability in assessing Dr. Allison's and Dr. Knox-Carter's RFCs. The ALJ stated that "[c]onsideration has been given [to] the opinions of the state agency consultants in accordance with Social Security Ruling 96-6p. These assessments are accepted as valid in that they are supported by and consistent with the record as a whole." (Tr. 21.) Both Dr. Allison and Dr. Knox-Carter listed the plaintiff's MRI exams and the medical opinions of other examining sources as support for their findings. (Tr. 206-07, 244-45.) Given that the opinions of the plaintiff's treating physicians, Dr. Sun and Dr. Harder, were not assigned controlling weight, and that Dr. Allison and Dr. Knox-Carter arrived at their limitations by examining objective tests and the medical evidence of other examining sources, the ALJ did not err in affording significant weight to their RFCs.

25

## 2. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain.

The plaintiff asserts that the ALJ failed to properly evaluate her subjective complaints of pain since her treating physicians' medical findings and medical tests support her credibility. Docket Entry No. 19, at 16-19. The ALJ found that

> [a]fter considering the evidence of record, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible as documented by records from treating sources and examining sources as discussed in the preceding paragraphs. [The plaintiff's] primary complaints are related to pain. While objective findings are present, they do not provide a basis for debilitating limitations of function. Furthermore, the record documents that there was a good response to medications.

(Tr. 21.) The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [her] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, [she] must clearly state [her] reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain her credibility determination such that both

26

the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[17] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of underlying physical medical conditions: the plaintiff has been diagnosed with lumbosacral spondylosis, cervical spine spondylosis, arthritis, osteoporosis, and postlaminectomy syndrome. (Tr. 232, 250, 252, 267, 270, 273, 276-300, 318, 321.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a

_____

[17] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

27

severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[18]

The plaintiff argues that her treating physicians' medical findings and her objective medical tests confirm the severity of her impairments and the pain that her impairments cause. Docket Entry No. 19, at 17. The ALJ acknowledged that the "objective medical evidence does verify [the plaintiff's] spinal impairments," but just not to the degree of intensity and persistence that she alleged. (Tr. 20.) In making her credibility determination, the ALJ relied on medical records from both treating and examining sources, prescribed medication, MRIs, and a nerve conduction study. (Tr. 20-21.)

The medical findings of the plaintiff's treating physicians do not support the intensity or severity of her subjective complaints of pain. *See* Tr. 183-88, 267, 270, 273, 276, 278, 280-95, 299-303, 318, 320-21. Dr. Sun's progress notes indicate that the plaintiff's treatment plan and

---

[18] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

medication regimen rarely changed (tr. 267, 270, 273, 276, 278, 280-95, 299-303, 318, 320-21), that the plaintiff reported that her oral medications stabilized her pain (tr. 274, 289, 293, 295), and that the prescribed medications were able to control the plaintiff's conditions. (Tr. 277, 279, 281-86.) Dr. Harder's progress notes show that she diagnosed the plaintiff with lower back pain and a bulging disc, and that she prescribed Lortab (tr. 185-88), but her treatment notes do not indicate the severity of the plaintiff's lower back pain and her treatment plan remained relatively unchanged. *Id.*

The record also shows that the plaintiff underwent several MRIs and a nerve conduction study. (Tr. 152, 177-78, 229, 252, 296-98.) However, as previously discussed, the plaintiff's MRIs and nerve conduction study largely indicated that her back impairments were mild or "not significant." *Id.* Even when an MRI revealed a left paracentral herniated nucleus pulposus ("HNP") causing mild stenosis, severe narrowing of the left lateral recess, mild left foraminal stenosis and possible nerve impingement at the L2-L3 level (tr. 152), Dr. O'Brien and Dr. Lien reviewed the results and found, respectively, that the "L2-3 disc findings are not clinically significant" (tr. 153) and that she had a "left sided disk herniation at L2-L3" but that her symptoms did not coincide with that diagnosis. (Tr. 147.) In sum, the plaintiff's MRIs, nerve conduction study, and treating physicians' treatment notes demonstrate that her impairments cause her a certain amount of pain, but that the same objective medical evidence simply does not support the plaintiff's subjective complaints that her pain is disabling.

### 3. The ALJ's hypothetical questions to the VE accurately reflected the plaintiff's limitations.

The plaintiff contends that the ALJ erred in relying on the VE's testimony regarding her ability to perform past work, since the hypotheticals that she posed to the VE did not properly reflect

29

all of the plaintiff's impairments. Docket Entry No. 19, at 19-22.  The regulations allow the ALJ to

rely on a VE at step four to determine whether a plaintiff is able to perform her past work. 20 C.F.R.

§ 404.1560(b)(2).  The VE's testimony, in response to an ALJ's hypothetical question, will be

considered substantial evidence "'only if that hypothetical question accurately portrays [the

plaintiff's] individual physical and mental impairments.'"  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed.

Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777,

779 (6th Cir.1987)).  Although a hypothetical must accurately portray a plaintiff's impairments, an

ALJ "is required to incorporate only those limitations that [she] accepts as credible." *Griffeth*, 217

Fed. Appx. at 429 (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th

Cir.1993)).

　　In this case, the ALJ asked the VE to consider Dr. Allison's and Dr. Knox-Carter's RFC

assessments and Dr. Sun's PCE when determining what type of work the plaintiff would be able to

perform. (Tr. 342-43.)  The VE found that Dr. Allison and Dr. Knox-Carter's RFC assessments

indicated that the plaintiff would be able to return to all of her past jobs except the jobs as cook and

factory laborer. *Id.*  The VE also testified that Dr. Sun's PCE indicated that the plaintiff would be

precluded from performing full time work. (Tr. 343.)  The ALJ gave significant weight to

Dr. Allison's and Dr. Knox-Carter's RFCs since "they are supported by and consistent with the

record as a whole," and, as previously discussed, she afforded little weight to Dr. Sun's findings

since those findings were not supported by either his treatment notes or the record medical evidence.

(Tr. 21.)  Furthermore, Dr. Allison's and Dr. Knox-Carter's RFC assessments relied upon the

treatment notes from the plaintiff's examining physicians and her MRIs. (Tr. 206-07, 244-45.)

Substantial evidence in the record supported the ALJ's hypotheticals that were based on

30

Dr. Allison's and Dr. Knox-Carter's RFC assessments, rather than Dr. Sun's PCE. (Tr. 21, 343-43.) Therefore, the ALJ properly relied on the VE's testimony that found the plaintiff could perform her past relevant work as an assistant manager, sewing machine operator, cashier, floor manager, and production worker. (Tr. 21.)

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 18) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

31